ELLIS GEORGE LLP
Todd M. Lander (State Bar No. 173031)
  tlander@ellisgeorge.com
2121 Avenue of the Stars, 30th Floor
Los Angeles, California 90067
Telephone: (310) 274-7100
Facsimile: (310) 275-5697

Attorneys for Plaintiff Nevada Jet
Ventures, LLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEVADA JET VENTURES, LLC, a Nevada limited liability company, <br><br> Plaintiff, <br><br> vs. <br><br> EXCELAIRE LLC, a Delaware limited liability company; and DOES 1 through 10, <br><br> Defendants. | Case No. 2:25-cv-07683 <br><br> **COMPLAINT FOR:** <br><br> **(1)** Fraud in the Inducement <br> **(2)** Conversion <br> **(3)** Violation of Penal Code Section 496 <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff Nevada Jet Ventures, LLC (collectively "Plaintiff," or "NJV"), brings this Complaint against Defendant ExcelAire LLC ("Excel" or "Defendant"), and alleges that:

## INTRODUCTION

1.      This lawsuit is the result of Excel's naked misrepresentations in connection with an Aircraft Dry Lease Agreement (the "Agreement") NJV signed with ExcelAir LLC ("Excel") on June 2, 2025, and under which Excel leased a Gulfstream GV N626JE bearing serial number 642 (the "Aircraft"), and a pair of Rolls Royce BMW engines with serial numbers 11396 and 1197.[1] But since that Agreement was signed, Excel has engaged in what can only be described as a pattern of fraud and deception on Excel's part, all in a transparent attempt to convince and coerce NJV to pay for maintenance expenses that are plainly Excel's contractual responsibility.  NJV will not allow this deception to continue.

2.      The basic facts are simple.  Excel personnel, *after* the Agreement was signed, arrived at the Van Nuys airport in May and spent two hours examining the Aircraft and its physical condition.  They apparently considered the Aircraft airworthy, because they proceeded to fly it halfway across the country on June 10 to Houston, and then – according to the Federal Aviation Administration ("FAA") – twice flew it from Texas to Eagle, Colorado, on June 14 and June 19, respectively. But both those flights were without appropriate assignment papers, prompting the FAA to cite NJV for Excel's unauthorized flights.

3.      At some point, while flying the Aircraft around the country, Excel went about dissembling the Aircraft under the guise of routine inspections, and falsely represented to NJV that various parts and components – including flight critical items such as brakes and other essential parts – were in a state of urgent disrepair and the previous lessee had failed in its basic maintenance obligations.  It then

---

[1] *See* **Exhibit 1**.

insisted, on the basis of those falsehoods, that ***NJV immediately pay $770,000 to repair the Aircraft and place it in the condition contemplated by the Agreement, in addition to hundreds of thousands of dollars in further repairs Excel claimed were needed.*** Excel assured NJV that because the prior lessee had breached its contractual obligations, the costs of repair could be recovered by that lessee. NJV and Brumbaugh initially believed these falsehoods, and consequently sent Excel the full amount requested – in excess of $770,000 – because they believed it was essential to render the Aircraft airworthy.

4.    Excel, in turns out, was engaged in nothing more than a fraudulent scheme to induce NJV to fund nearly $1 million in repairs that are Excel's responsibility under the Agreement. That NJV ultimately provided Excel over $770,000 to cover the costs of those lessee repairs only serves to underscore the depth and effect of the fraudulent misrepresentations made to, and relied upon by, Mr. Brumbaugh.

5.    NJV repeatedly conveyed to Excel that it was prohibited from using any of the funds NJV provided – and indeed, demanded that it be returned. NJV further demanded that Excel immediately undertake to conduct and complete any maintenance required on the Aircraft and which is the lessee's responsibility under the Agreement. Excel has refused. This lawsuit consequently ensued.

## PARTIES

6.    Plaintiff Nevada Jet Ventures, LLC, is a Nevada limited liability company with its principal place of business in Van Nuys, California.

7.    Defendant ExcelAire LLC, a Delaware limited liability company with its principal place of business in Ronkonkoma, New York.

8.    The true names and capacities, whether individual, corporate, associate or otherwise, herein named as Does 1 through 10 inclusive, are unknown to Plaintiff at this time. Plaintiff therefore sues these cross-defendants by fictitious names. Does 1 through 10 include any other person claiming any legal or equitable right, title,

1  estate, lien, or interest in the property that is the subject of this Complaint. Plaintiff

2  is informed and believes, and thereon alleges, that some or all of said fictitiously

3  named defendants, as set forth herein, are responsible, in whole or in part, for the

4  occurrences herein alleged and that Plaintiff's injuries and damages, as herein

5  alleged, were proximately caused by those defendants. Plaintiff will amend this

6  Complaint to state their true names and capacities when the same have been

7  ascertained. Plaintiff intends all further references in this Complaint to "Defendant"

8  to expressly include reference to each fictitiously named defendant.

9       9.    Plaintiff is informed and believes, and based thereon alleges, that each

10  Defendant at all times mentioned in this Complaint was the agent, employee,

11  partner, joint venture, alter ego, and/or employer of the other Defendant and was at

12  all times herein mentioned acting within the course and scope of that agency,

13  employment, partnership, ownership or joint venture. Plaintiff is further informed

14  and believe, and thereon alleges, that the acts and conduct of each Defendant were

15  known to, authorized by and/or ratified by the other Defendants, and each of them.

## JURISDICTION AND VENUE

17      10.   This litigation is a civil action over which this Court has original

18  diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(2) based on diversity of the

19  parties and the amount in controversy exceeding $75,000.

20      11.   The contract between Plaintiff and Defendant that is the subject of this

21  action was issued to Plaintiff in this District and the losses Plaintiff incurred

22  occurred in this District. Therefore, venue is proper in this District pursuant to 28

23  U.S.C. § 1391.

## GENERAL ALLEGATIONS

25  **The Agreement**

26      12.   The Agreement is clear and unambiguous in several important respects:

27      •   ***Section 3.1*** – The term of the Agreement is 36 months.

28      •   ***Section 4.1*** – The Lessee (Excel) "shall pay, or cause to be paid,

directly to the provider thereof, all costs, expenses, fees, and charges incurred in connection with the Lease Operations as such arise during the Lease Term.

• **Section 7(1)** – The Lessee (Excel) "***shall be responsible . . . for the servicing, repair, inspection, maintenance and overhaul of the Aircraft during the Lease Term***. The Aircraft shall be maintained, inspected, serviced, repaired, overhauled and tested *in accordance with*: (i) *all maintenance manuals initially furnished with the Aircraft*, including any subsequent amendments or supplements to such manuals issued by the manufacturer from time to time, (ii) all statutes, laws, ordinances, *regulations and standards or directives issued by any governmental agency applicable to the maintenance of the Aircraft*, including (A) all mandatory or otherwise required service bulletins issued, supplied, or available by or through the applicable manufacturer, and (B) *all airworthiness directives applicable to the Aircraft issued by the FAA (and causing such directives and bulletins to be completed through corrective modification in lieu of operating manual restrictions, when and to the extent commercially reasonable)*.

• **Section 7(3)** – "All maintenance procedures shall be undertaken and completed *in accordance with the manufacturer's recommended procedures*, and by properly trained, licensed, and certificated maintenance sources and maintenance personnel, so as to keep the Aircraft, each engine and every component and system of each: (i) in as good operating condition and appearance as when delivered to Lessee hereunder, ordinary wear and tear excepted, and (ii) *in such operating condition as may be necessary to enable the U.S. FAA Standard Airworthiness Certificate (and any other applicable certificate, license, registration or authorization)* to be maintained in good standing at all times during the Lease Operations. Lessee shall be liable to Lessor for (i) any direct damage to the Aircraft which occurs in connection with the Lease Operations or (ii) any abuse or misuse of the Aircraft which may compromise, prejudice, or invalidate any of the manufacturer's and supplier's warranties applicable to the Aircraft, which in either

1  (i) or (ii) above is attributable to the negligence or willful misconduct of Lessee or

2  any employee, agent and/or guest thereof during any Lease Operations, reasonable

3  wear and tear excepted

4      •    **Section 7(5)** – The Lessee (Excel) "shall, at Lessee's cost and expense,

5  replace or have repaired parts, instruments, appurtenances, accessories, and other

6  equipment or components of the Aircraft that may have become worn out, lost,

7  destroyed, damaged or otherwise rendered unfit for use for any reason whatsoever.

8  All such replacements or repairs installed on or incorporated into the Aircraft shall

9  upon such installation or incorporation become the property of Lessor.  Lessor shall,

10  at Lessor's expense, replace or have repaired appliances and furnishings that

11  become worn out, lost, destroyed, damaged or otherwise rendered unfit for use for

12  any reason whatsoever.

13      •    **Section 12 – REPRESENTATIONS AND WARRANTIES OF**

14  **LESSOR. THE AIRCRAFT IS LEASED TO LESSEE BY LESSOR**

15  **HEREUNDER "*ASIS" AND LESSOR SHALL NOT BE DEEMED TO HAVE***

16  ***MADE ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED,***

17  ***EXCEPT THAT LESSOR WARRANTS TITLE AND AIRWORTHINESS***.

18      •    **Section 18.1** – **LESSEE HAS REVIEWED THE AIRCRAFT'S**

19  **MAINTENANCE RECORDS AND OPERATING LOGS AND HAS FOUND**

20  **THAT, DURING THE TWELVE MONTHS (12) PRECEDING THE DATE**

21  **OF THIS AGREEMENT, THE AIRCRAFT HAS BEEN MAINTAINED AND**

22  **INSPECTED UNDER PART 91 AND PART 135 OF THE FARS. LESSEE**

23  **CERTIFIES THAT THE AIRCRAFT WILL BE MAINTAINED AND**

24  **INSPECTED UNDER FAR PART 91 AND PART 135 FOR OPERATIONS**

25  **TO BE CONDUCTED UNDER THIS AGREEMENT**

26      13.    These terms are clear and unambiguous.  Excel took possession of the

27  Aircraft on an "as is" basis and without any representations or warranties from NJV

28  concerning the physical condition of the Aircraft.  Excel further committed and

1  agreed that: (1) it was responsible for maintenance of the Aircraft; (2) it was

2  responsible for maintenance of the Aircraft in accordance with the manufacturer's

3  recommendations; (3) it was responsible for maintaining the Aircraft in accordance

4  with the FAA's airworthiness and other regulations; and (4) it reviewed the

5  Aircraft's maintenance records and operating logs *before signing the Agreement,*

6  and willingly entered into the Agreement after doing so.[2]

7        **Excel's Fraud And Misrepresentations**

8        14.    There should have been, in short, no surprises concerning this Aircraft

9  or its physical condition.  Excel took possession after physically inspecting the

10  Aircraft in Van Nuys and deciding that it could safely be flown to Texas,

11  demonstrating without ambiguity that in considered the Aircraft airworthy.  Beyond

12  that, however, NJV received a citation letter from the FAA on July 11, 2025,

13  indicating an anonymous complainant had reported that "on June 14, 2025, Operator

14  ExcelAire LLC operated and illegal 135 charter using aircraftN626JE, call sign

15  XLS502, from Addison Airport (ADS) in Addison, Texas to Eagle County Regional

16  Airport (EGE) in Eagle County, Colorado then on June 19, 2025, from June 19,

17  2025 from George Bush Intercontinental Airport (IAH) in Houston, Texas, to EGE."

18  *See* **Exhibit 3**.  Excel, in short, not only defrauded NJV, it created regulatory

19  problems through its unlawful operation of the Aircraft – the same Aircraft it now

20  contends is not flightworthy.

21        15.    That remarkable compounding of its misconduct aside, Excel was

22  required under the Agreement to conduct whatever maintenance and repairs were

23  necessary to prepare the Aircraft for chartering.  What it did instead was launch a

24  striking campaign aimed at convincing NJV and Charles Brumbaugh – NJV's

25  principal – that the prior lessee had failed in its basic maintenance requirements and

26

27  [2]      Excel was also afforded the opportunity to inspect the Aircraft prior to

28  signing the Agreement.

that the Aircraft was consequently subject to several physical defects that violated Federal Aviation Regulations (FAR) and/or Gulfstream's safety recommendations. Indeed, Excel affirmatively represented to Mr. Brumbaugh and me during a June 10, 2025 call that several of the items were demonstrably contrary to FAR safety requirements and Gulfstream recommendations, and that they breached the lease agreement between NJV and its prior lessee.

16.    Among many others, and by way of example only, Excel contended that landing gear inspection demonstrated that the gear was in need of *immediate* replacement. Specifically, it asserted that: (1) the joints and fasteners in the landing gear and brakes were corroded, and that the ability to handle contact or environmental exposure may have been compromised; (2) the brake assembly numbers 1, 2 and 3 had less than 10% usage remaining, essentially meaning their reasonable life span had long since expired; and that the prior lessee continued flying the Aircraft even as the brakes reached this critical level; (3) the brakes' life span had expired under Gulfstream safety recommendations and FAA/FAR guidelines, and could not be subject to continued use; and (4) two of the four tires were dry rotted, all four tires exhibited serious and irreparable structural damage.

17.    The *true facts* are that while there undoubtedly was wear and tear on the landing brakes and gear, all four brakes have life remaining on them and, most importantly, none are in violation of Gulfstream's safety recommendations and requirements. And all four brakes have current remaining life and can be operated in compliance with Gulfstream and FAA/FAR requirements.

18.    Excel then compounded those fraudulent misrepresentations about the brakes by insisting that NJV pay for the costs of repair those various problems and defects – because they were purportedly the responsibility of the prior lessee – in order for Excel to begin operating the Aircraft under the Agreement.[3] And it

---

[3]    There were other examples of Excel's misrepresentations. Excel specifically

1    claimed that NJV could recover its costs by suing the prior lessee for breach.  That

2    was the sole basis on which NJV sent the money it sent, and that basis was

3    completely false.

4            **Excel, on the Basis of its Fraud, Induces NJV to Fund $770,000 In**

5            **Repairs for which Excel is Responsible**

6            19.     These examples are hardly exhaustive, and the scope and scale of this

7    fraudulent conduct – particularly given that Excel exploited the specter of purported

8    non-compliance with  FAR/FAA safety regulations and airworthiness, is

9    breathtaking in scope and stark in its perfidiousness.  Excel willingly signed an

10   Agreement in which it accepted the Aircraft "as is" and where it accepted the

11   responsibility for maintenance and repairs.  But after taking possession and flying

12   the Aircraft across the country, it apparently decided quickly, and without a hint of

13   fidelity to its contractual obligations, to foist the full scope of the Aircraft's

14   necessary repairs – onto NJV and Mr. Brumbaugh.

15           20.     Ultimately, and consummating its fraudulent scheme, Excel coerced

16   NJV – through its false representations – to immediately send it $770,967 in order to

17   conduct repairs on the Aircraft.  Nor was that the full scope of the alleged repairs

18   requiring attention – Excel claimed there were hundreds of thousands of dollars in

19   additional work that was necessary.  But NJV transmitted the initial $770,967 as a

20   testament to its good faith commitment to flight safety, and its expectation that a

21   contracting partner such as Excel would not deliberately defraud it.  And yet that is

22   precisely what happened, and the result is that Excel is presently holding $770,967

23   in funds to which it is not entitled and should never have received – but for its fraud.

24   / / /

25

26   _____

27   reported that The WiFi, the Satcom and the Airshow Tracking are all disabled and
     broken.  Beyond that, it claimed that the prior lessee had deliberately disabled and
     sealed these systems, in clear violation of the terms of the Agreement.  But the ***true***

28   ***facts*** are that these two systems were merely turned off, but were not broken or
     unable to operate.

21.     This spate of misrepresentations and exploitation of NJV's safety concerns and focus has necessarily forced NJV to reconsider its entire commercial relationship with Excel.  Simply put, it cannot do business with a contracting party that can so thoroughly and breezily commit fraud.

22.     Accordingly, NJV reasonably and necessarily demanded that:  (1) Excel return to NJV *immediately* and without condition or reservation the $770,967 it received in recent days; (2) Excel conduct all necessary repairs on the Aircraft – immediately and without condition or reservation – and ensure the Aircraft is airworthy and available for chartering promptly; (3) Excel provide a full and complete inventory of all repairs, maintenance logs and any other documentation reflecting maintenance on the Aircraft, so NJV may verify the quality and comprehensiveness of Excel's work, and affirm its compliance with FAR/FAA regulations and Gulfstream recommendations; and (4) Excel cease and desist from taking any parts from the Aircraft and placing them on any other plane. *See* **Exhibit 2.**

23.     NJV further demanded that the $770,967 in funds be returned by wire no later than the close of business of July 28, 2025, and that Excel confirm in writing by that same date and time its confirmation that it will conduct – at its own expense – all necessary repairs to the Aircraft.  Excel refused.

## FIRST CLAIM FOR RELIEF

### (Fraud in the Inducement Against All Defendants)

24.     NJV hereby restates and realleges the allegations set forth in paragraph 1 through 22, as though alleged in full herein.

25.     At the time Excel executed the Agreement, it did so with the intention of deceiving NJV.  Specifically, the representations Excel made in the Agreement concerning its obligations to conduct any and all appropriate maintenance on the Aircraft – including without limitation the obligations in paragraphs 7(1), 7(3) and 7(5).  Excel was required under the Agreement – and represented as such –to

1  conduct whatever maintenance and repairs were necessary to prepare the Aircraft

2  for chartering.

3        26.    The representations Excel made were false at the time they were made.

4  The true facts are it never intended to honor those contractual promises and instead

5  intended to concoct a scheme to force NJV to pay for exorbitant maintenance costs.

6  Indeed, in furtherance of that scheme, Excel embarked on an elaborate campaign

7  aimed at convincing NJV and Charles Brumbaugh – NJV's principal – that the prior

8  lessee had failed in its basic maintenance requirements and that the Aircraft was

9  consequently subject to several physical defects that violated Federal Aviation

10  Regulations (FAR) and/or Gulfstream's safety recommendations.  Indeed, it

11  affirmatively represented to Mr. Brumbaugh during a June 10, 2025 phone call that

12  several of the items were demonstrably contrary to FAR safety requirements and

13  Gulfstream recommendations, and that they breached the lease agreement between

14  NJV and its prior lessee.

15        27.    Ultimately, and consummating its fraudulent scheme, Excel coerced

16  NJV – through its false representations – to send it $770,967 in order to conduct

17  repairs on the Aircraft.  That NJV did so is a testament to its good faith commitment

18  to flight safety, and its expectation that a contracting partner such as Excel would

19  not deliberately defraud it.  And yet that is precisely what happened, and the result is

20  that Excel is presently holding $770,967 in funds to which it is not entitled and

21  should never have received – but for its fraud.

22        28.    Had NJV known the true facts it would have acted differently and,

23  specifically, would not have signed the Agreement and certainly would not have

24  parted with the $770,967 in funds Excel elicited through its false pretenses.

25        29.    NJV is informed and believes, and on that basis alleges, that DOES 1

26  through 10 have substantial assistance and/or encouragement to Excel, and for the

27  purposes of facilitating the wrongful conduct alleged above.  DOES 1 through 10

28  were consequently a substantial factor in causing harm to NJV.

30.    As a direct and proximate result of Excel's fraud, NJV has been damaged in an amount to be proven at trial, but not less than $770,967.

31.    Excel's and Defendants conduct, as alleged above, was despicable and in reckless disregard for the rights of NJV, and in doing the things alleged in this Complaint were guilty of oppression and malice.  Accordingly, NJV seeks punitive damages.

## SECOND CLAIM FOR RELIEF

### (Conversion Against All Defendants)

32.    NJV hereby restates and realleges the allegations set forth in paragraph 1 through 31, as though alleged in full herein.

33.    NJV owned and had the right to possess the $770,967 Defendants wrongfully induced NJV to send Defendants.

34.    The Defendants refusal to return the $770,967, despite NJV's demand for the return of the funds, intentionally and substantially interfered with NJV's ownership and possession of those monies.

35.    NJV was harmed as a result of Defendants taking the $770,967 and refusing to return it despite NJV's demand.

36.    NJV is informed and believes, and on that basis alleges, that DOES 1 through 10 have substantial assistance and/or encouragement to Excel, and for the purposes of facilitating the wrongful conduct alleged above.  DOES 1 through 10 were consequently a substantial factor in causing harm to NJV.

37.    Excel's and Defendants conduct, as alleged above, was despicable and in reckless disregard for the rights of NJV, and in doing the things alleged in this Complaint were guilty of oppression and malice.  Accordingly, NJV seeks punitive damages.

/ / /

/ / /

/ / /

**THIRD CLAIM FOR RELIEF**

**(Violation of Penal Code Section 496 Against All Defendants)**

38.     NJV hereby restates and realleges the allegations set forth in paragraph 1 through 37, as though alleged in full herein.

39.     Where one, through mistake or fraud receives money to which he is not entitled, he becomes the trustee of that money for the benefit of the one justly entitled to it. (Cal. Civ. Code § 2224.)  In the course of, and by virtue of the above-averred acts, Excel fraudulently converted and used the $770,967 for its own use and exclusive benefit and with the intent to deprive NJV of its use of the monies.

40.     One who fraudulently appropriates property which has been entrusted to him is guilty of theft. (Cal. Pen. Code § 484.)

41.     The Defendants actions as described above constitute violations of Penal Code Section 496.  As a result of Defendants' violation of Penal Code section 496, NJV is entitled to a just award of treble damages ($2,312,901), costs of suit, and reasonable attorneys' fees. (Penal Code section 496(c); *Bell v. Feibush* (2013) 212 Cal.App.4th 1041.).

42.     As a direct and proximate result of Defendants' actions, NJV has suffered, and continues to suffer, actual damages in amount to be proven at trial, but which include, among other things, the value of the monies that it entrusted to Defendants, interest, attorneys fees, and costs.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff prays for judgment against Defendant as follows:

1.     On the First Claim for Relief, for rescission of the Agreement, and all restitutionary damages available under the law.

2.     On the Second Claim for Relief, all damages available under the law.

3.     On the Third Claim for Relief, treble damages according to proof at trial, but not less than $2,312,901.

4.     On all Claims for Relief, temporary, preliminary and/or permanent

1   injunctive relief, reasonable attorneys' fees to the extent allowed by law, for costs of

2   suit incurred, for interest allowable by law, and any such other relief the Court

3   deems just and proper.

4

5   DATED:  August 15, 2025          ELLIS GEORGE LLP

6

7

8   By _____

9                                                      Todd M. Lander
                                                       Attorneys for Plaintiff Nevada Jet
10                                                     Ventures, LLC

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury of all issues such triable.

DATED:  August 15, 2025          ELLIS GEORGE LLP

By _____
                                    Todd M. Lander
                                    Attorneys for Plaintiff Nevada Jet
                                    Ventures, LLC